

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HAROLD J. GORMAN       *       CIVIL ACTION

VERSUS       *       NO: 03-3624

SEWERAGE AND WATER BOARD OF    *       SECTION: "D"(4)
NEW ORLEANS, ET AL

## O R D E R

Before the court is the **"Motion for Summary Judgment"** filed by
Defendant, the Sewerage and Water Board of New Orleans (S&WB),
seeking dismissal of Plaintiff's Family Medical Leave Act claims.
Plaintiff, Harold J. Gorman, opposes the motion.  The motion, set
for hearing on Wednesday, August 3, 2005, is before the court on
briefs, without oral argument.   Now, having considered the
memoranda of counsel, the record, and the applicable law, the court
finds there are no genuine issues of material fact, and as a matter
of law, Defendant is entitled to summary judgment dismissal of
Plaintiff's Family Medical Leave Act claims.

## I.  Background

In 1986, Plaintiff was appointed as the Executive Director of
the S&WB.  In May 2002, C. Ray Nagin was elected as Mayor of New

Orleans and as Mayor, he holds the position of President of the S&WB. (Throughout this Order, the court intermittently refers to both Mayor Nagin and President Nagin).

When Mayor Nagin took office, the Board members suggested that he make an immediate change in the Executive Director position because they felt "the agency was not going in the proper direction ... some of the practices and procedures of the agency were causing inefficiencies" and "new thinking and leadership were needed." (Defendant's Ex. B, Nagin Dep. at 18).

As for specific reasons why Plaintiff should be removed as Executive Director, the Board told Mayor Nagin about "rate increases, ... a lot of barrels that were in the street that suggested that work that had to be done hadn't been done, ... the backlog of service calls." (*Id.* at 19). The Board "felt as though there was not a sense of urgency in the organization to effectively deal with those issues." (*Id.*).

Mayor Nagin also testified that the move to make a change at the top "was pretty much across the Board. And that caused [him] to pause a little bit, because normally you wouldn't have that kind of common sense of the need for a change." (*Id.* at 19-20).

Mayor Nagin did not initially move forward to make a change, because the S&WB was considering privatization of management. However, by October 2002, the Board rejected all bids for private management thereby effectively ending the privatization issue, and

2

in early 2003, Mayor Nagin began to consider a change in the Executive Director's position.

On February 18, 2003, Mayor Nagin met with Plaintiff, and requested his retirement.[1]  (*Id.* at 23).  Mayor Nagin and Plaintiff agreed that Plaintiff would retire, but the specifics needed to be worked out.  (*Id.* at 23-28, Defendant's Ex. C, Nagin Dep. at 23-24; Defendant's Ex. A, Plaintiff's Dep. at 64-68; Defendant's Ex. E, Rice Dep. at 13-14).

While there is no evidence that Plaintiff had a set deadline to resign and retire, there is also no evidence that Plaintiff had an indefinite time period to do so.  Rather, Mayor Nagin explained that following their February 18, 2003 conversation, he and Plaintiff "were going to get together ... in pretty short order to discuss the matter further, and he "probably" gave Plaintiff two weeks (or a month at the latest) "to get back with [him]" to "finalize exactly how [they] were going to proceed."  (Defendant's Ex. B, S&WB Dep. through Nagin, at 25; and Defendant's Ex. C, Nagin Personal Dep. at 23-24).

However, Plaintiff did not contact Mayor Nagin in the two weeks after their February 18, 2003 to finalize Plaintiff's retirement.  On or about March 6, 2003, Plaintiff went on medical

---

[1]     Mr. Charles Rice, the Chief Administrative Officer for the City of New Orleans, was also present when the Mayor and Plaintiff had this conversation on February 18, 2003.  (Defendant's Ex. E, Rice Dep. at 13-14).

leave for treatment of skin cancer.[2]   (Plaintiff's Dep. at 92).
Mayor Nagin testified that when he had his conversation with
Plaintiff on February 18, 2003, he did not know that Plaintiff had
been diagnosed with skin cancer.  (Defendant's Ex. B at 25).

On March 12, 2003, Plaintiff underwent surgery for his skin
cancer.  In late March/early April 2003, Plaintiff returned to work
for approximately one week, traveling to New York City and
Washington, D.C., to present speeches at conferences that had been
scheduled several months earlier.  (*Id.* at 142-43).  After that
week, however, Plaintiff remained on paid sick leave through his
termination (which as discussed below was on June 18, 2003).[3]

On April 16, 2003, the Board of Directors of the S&WB met for
their April meeting.  At this meeting, Mayor Nagin told the Board
that he had met with Mr. Gorman in February 2003, there had been a
follow-up conversation[4] and Mr. Gorman had written the Mayor a

---

[2]     Plaintiff testified in his deposition that he "believe[d]" the
last day he worked before taking medical leave was March 6, 2003.
(Plaintiff's Dep. at 92).  However, in the Joint Pre-Trial Order, the parties
have submitted as Uncontested Material Fact No. 2 that "Gorman's sick leave
began on March 6, 2003.  Thus, the court concludes that **March 6, 2003** is the
first day of Plaintiff's FMLA leave.

[3]     While Plaintiff remained on "sick leave" through June 18, 2003,
his 12-weeks of FMLA leave ended on June 5, 2003.  (*See* court's discussion of
Plaintiff's FMLA leave, *infra*, pp. 10-11).  After his FMLA leave ended,
Plaintiff was still carried on "sick leave" because he had not exhausted his
sick and annual leave benefits.  (St. Martin Corporate Dep. at 155).

[4]     Plaintiff testified that this telephone conversation occurred on
March 10, 2003.  (Plaintiff's Dep. at 125-26).  Mayor Nagin testified that
this telephone conversation was supposed to be a follow-up on their initial
February 18, 2003, conversation, but it ended up being a very short
conversation because Plaintiff told Mayor Nagin he was at a doctor's office
doing pre-op for surgery. (Defendant's Ex. B at 26-28; Plaintiff's Dep. at
130). Mayor Nagin ended that "follow-up" conversation asking Plaintiff to call

4

letter.[5]  But "there was [basically] little to no movement beyond that."  (Ex. B, Nagin Dep. at 31).   The Board responded by authorizing the Mayor to implement personnel changes.  (Defendant's Ex. G, Minutes of April 16, 2003 Board meeting).

Plaintiff submits that before this April 2003 meeting, he talked to the President Pro Tem, Henry Dillon, who agreed to let Plaintiff set a retirement date in August 2003.  (Defendant's Ex. A, Plaintiff's Dep. at 78).  Mr. Dillon testified that he did not have a problem with allowing Mr. Gorman to stay on until August 1, 2003, but he doesn't recall bringing that discussion to the Board's attention at the April 2003 meeting.  (Defendant's Ex. F, Dillon Dep. at 19).  And the Board can only act at its official Board of Directors' meetings.  (S&WB Dep. through St. Martin, at 79-80).

After the April 2003 Board meeting, Mayor Nagin delegated to Mr. Charles Rice, the City's Chief Administrator Officer, the task of trying to conclude "on a certain date" the negotiations with Mr. Gorman concerning his resignation and retirement.  (Defendant's Ex. B, Nagin Dep. at 36).  Mayor Nagin explained that he had been "kind of chasing" Plaintiff for months and wanted to get the negotiations "to a better place."  (Id.).

---

him at a better time. (Defendant's Ex. B at 27).

[5]     In a letter dated February 20, 2003, Plaintiff wrote Mayor Nagin expressing his disappointment that the Mayor's request for his retirement was to be published in the newspaper contrary to Plaintiff's understanding that the matter was to remain confidential. (See February 20, 2003 letter, attached to Plaintiff's Deposition as Ex. 2).

On May 21, 2003, the S&WB Board of Directors held its next meeting.[6]  During this meeting (in which President Nagin was not present), Mr. Rice telephoned Plaintiff (and at least according to Plaintiff), Mr. Rice asked Plaintiff: "Do you want to resign or be fired?" (Plaintiff's Dep. at 80).  When Mayor Nagin was asked if he authorized Mr. Rice to use the words "either resign or be fired," Mayor Nagin testified:

> A.   It was probably not necessary, because we had already agreed, Mr. Gorman and I, that he was resigning.
>
> Q.   Okay.
>
> A.   It was just a matter of when.
>
> Q.   He was resigning and retiring?
>
> A.   Yes.
>
> Q.   You agree he was resigning and he was going to retire?
>
> A.   Yes, but at some point in time.  If we couldn't conclude this, then we would have to do something different.

(Defendant's Ex. B, Nagin Corp. Dep. at 37).

In any event, Mr. Rice admitted that he probably told Plaintiff, "Mr. Gorman, if we don't work out the details of your

---

[6]   Plaintiff admits that prior to this Board meeting, on May 14, 2003, the Mayor called him for the second time, asking Plaintiff to set up an appointment.  But Plaintiff was at another doctor's office. (Plaintiff's Dep. at 130).  When Plaintiff subsequently telephoned to make an appointment, he was told that he had to do that through e-mail and then his request would be considered.  (Id. at 131; see also Plaintiff's Dep. at 79-80).

Plaintiff also testified that he received a telephone message from Mr. Rice on May 20, 2003, and that he tried to call Mr. Rice back but was unsuccessful.  (Plaintiff's Dep. at 79-80, 131-32).

resignation, the Board is more than likely going to terminate you," because "as we discussed with him several months before, the Mayor wanted to move in a different direction, he wanted a new Executive Director." (Rice Dep. at 19).

On May 28, 2004, Mr. Rice sent Plaintiff a letter requesting a meeting with him on May 30, 2003, to discuss personnel matters. (*See* Plaintiff's Dep., Ex. 3). Plaintiff responded with a letter dated May 30, 2003, refusing the request and advising that he had retained legal counsel. (*See* Plaintiff's Dep., Ex. 4).

By the time of the next Board meeting on June 18, 2003, Plaintiff had not resigned or applied for retirement or the Deferred Retirement Option Plan (DROP) program,[7] and he had not presented the Mayor or Mr. Rice with a specific plan for his retirement and resignation. The Board unanimously voted to terminate him at that meeting. (Defendant's Ex. I, Minutes of June 18, 2003 Board meeting, p. 68).

After June 18, 2003, Plaintiff submitted an application to retire and asked that it be retroactive to June 18, 2003. (Plaintiff's Dep. at 105; and Defendant's Ex. D, St. Martin/S&WB at 44). Plaintiff did not apply for the DROP program until on or about March 26, **2005**. (*See* Plaintiff's Opp., Ex. 16, Plaintiff's letter dated March 26, 2005, addressed to Marcia St. Martin).

On December 29, 2003, Plaintiff filed this suit against the

---

[7]     *See* discussion of DROP, *infra*, pp. 20-23 & fns. 20-21.

SW&B, asserting three claims: (1) breach of contract; (2) age discrimination under Louisiana law; and (3) violation of the Family Medical Leave Act.  The court previously granted the SW&B's Motion for Partial Summary Judgment, dismissing Plaintiff's state-law claims for breach of contract and age discrimination.  (*See* Doc. No. 90, Court's Order entered on July 14, 2005).

Regarding his claims asserted under the Family and Medical Leave Act (FMLA), 29 U.S.C. §2601 *et seq.*, Plaintiff asserts that the S&WB willfully violated the FMLA because: (1) the S&WB discharged him while he was on FMLA leave; (2) the S&WB denied him the right to return to the Executive Director's position or an equivalent position after taking FMLA leave;  (3) the S&WB denied him the right to elect participation in the DROP program after taking FMLA leave; and (3) the S&WB retaliated against him for exercising his rights under the Family Medical Leave Act.  (*See* Second Amended Complaint, Counts 1-3, ¶¶32-37; *see also* Plaintiff's Opp. Memo. at 2-3).  The SW&B now moves for summary judgment on Plaintiff's Family Medical Leave Act claims.

## II.  Legal Analysis

Under the FMLA, an employer has both a prescriptive and proscriptive obligation to its employees.  *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 763 (5th Cir. 2001); *Chafin v. John H. Carter., Inc.*, 179 F.3d 316, 319 (5th Cir. 1999).

Under its **prescriptive obligation**, an employer must grant

employees substantive rights guaranteed by the FMLA.  *Chafin*, 179
F.3d at 319.  As summarized by the Fifth Circuit, those substantive
rights (that are applicable here) include

> the right to take unpaid leave for a period of
> up to 12 workweeks in any 12-month period when
> the employee has "a serious health condition
> that makes [him] unable to perform  the
> functions of [his] position"... Following a
> qualified leave period, the employee is
> entitled to reinstatement to the former
> position or an equivalent one with the same
> benefits and terms.

*Bocalbos v. Nat'l Western Life Ins. Co.*, 162 F.3d 379, 383, *noting*
29 U.S.C. §2612(a)(1)(D) and 29 U.S.C. §2614(a).

However, notwithstanding an employer's prescriptive duty,
nothing in the FMLA shall be construed to entitle any restored
employee to "any right, benefit, or position of employment other
than any right, benefit, or position to which the employee would
have been entitled had the employee not taken the leave."  29
U.S.C. §2614(a)(3)(B).  Thus, an employee's substantive rights
under the FMLA are *not* absolute.

Under its **proscriptive obligation**, an employer may not
penalize an employee from exercising his substantive rights
guaranteed by the FMLA. *Chafin*, 179 F.3d at 319.

To preserve the availability of the substantive rights
afforded by the FMLA, and to enforce them, the FMLA creates two
types of claims: **interference claims**, in which the employee asserts
that the employer denied or otherwise interfered with his

substantive rights under the FMLA (29 U.S.C. §2615(a)(1)); and **retaliation claims**, in which the employee asserts that his employer retaliated or discriminated against him for exercising his rights under the FMLA (29 U.S.C. §2615(a)(2)).[8]  *Bocalbos*, 162 F.3d at 383; *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001).

Here, Plaintiff has asserted both interference and retaliation claims.  As the court next discusses, Defendant is entitled to summary judgment on both types of these FMLA claims.

## (A)   Defendant is entitled to summary judgment on Plaintiff's interference or substantive claims.

### (1)   At the outset, the court finds that Plaintiff's substantive rights are expired.

Under the FMLA, Plaintiff was entitled to a total of 12 workweeks of leave in any 12 month period.   29 U.S.C.

---

[8]     The relevant part of the FLMA, 29 U.S.C. §2615, reads as follows:

**(a)   Interference with rights**

**(1)   Exercise of rights**

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

**(2)   Discrimination**

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

2612(a)(1)(D).  Plaintiff's FMLA leave began on March 6, 2003,[9] and
Plaintiff claims it ended on June 13, 2003.  (*See* Plaintiff's Opp.
Memo, p. 3).  But 12 weeks from March 6, 2003 is May 29, 2003, and
adding the one week in late May/early April 2003 that Plaintiff
returned to work to attend conferences in New York and Washington,
D.C., puts the expiration of Plaintiff's 12 weeks of FMLA leave on
**June 5, 2003**, which is one week earlier than Plaintiff claims.[10]

When Plaintiff's FMLA leave expired on June 5, 2003 (or even
assuming Plaintiff's FMLA leave expired on June 13, 2003 as
Plaintiff contends), Plaintiff did not return to work.  Rather,
Plaintiff remained on sick leave until he was terminated on June
18, 2003.[11]  (Plaintiff's Dep. at 93).

Thus, the court concludes that because Plaintiff failed to
return to work when his 12 weeks of FMLA leave expired, his right
to reinstatement as Executive Director of the S&WB or restoration

---

[9]      *See* fn. 2, *supra*.

[10]     Under the FMLA, an employee may take his leave "intermittently or
on a reduced leave schedule when medically necessary.  2 9 U.S.C. §2612(b)(1).
However, the total amount of FMLA leave is a "total of 12 workweeks ... during
any 12-month period."  29 U.S.C. §2912(a)(1).

[11]     Pursuant to 29 C.F.R. §825.214(b),

         [i]f the employee is unable to perform an essential
         function of the position because of a physical or
         mental condition, including the continuation of a
         serious health condition, the employee has no right to
         restoration to another position under the FMLA....

In his deposition, Plaintiff testified that he would not have been able
to return to work until August 1, 2003.  (Plaintiff's Dep. at 10).  However,
in opposition to Defendant's Motion for Summary Judgment, Plaintiff apparently
attempts to rehabilitate this testimony.  *See* fn. 18, *infra* and accompanying
text at pp. 19-20).

to an equivalent position, and his right to elect participation in the DROP program (as well as any other substantive right to any other benefit he claims he was denied) also expired. *Hunt*, 277 F.3d at 763.

Plaintiff argues that his substantive rights did not expire, because he claims that the S&WB terminated him or "constructively discharged" him at its Board meeting on May 21, 2003 (which date would fall within his allowed 12 weeks of FMLA leave). However, the court rejects this argument.

At its May 21, 2003 Board meeting, the Board passed Resolution R-090-2003 (entitled "Authorization to Temporarily Adjust the Compensation of the Deputy Director"), which simply acknowledged that Plaintiff had been on sick leave since March 6, 2003 and that the Deputy Director (Marcia St. Martin) had performed his duties in his absence. (*See* unsigned copy of Resolution R-090-2003, attached to Plaintiff's Opp. as Exhibit 6). Consequently, the Board gave the Deputy Director a retroactive pay raise and appointed her to **Interim** Executive Director effective June 2, 2003. (*Id.*). Nowhere does the Resolution terminate Plaintiff or appoint the Deputy Director as Executive Director.[12]

---

[12]     Indeed, as the court previously found in its Order granting the Defendant's Motion for Partial Summary Judgment on Plaintiff's breach of contract and age discrimination claims, the Board undertook a nation-wide search for a new Executive Director after Plaintiff was terminated. (*See* Order, Doc. No. 90, pp. 5-6). The fact that Ms. Martin was ultimately selected as Executive Director after the nation-wide search was conducted is of no significance to Plaintiff's erroneous argument that she was appointed to this position when Resolution R-090-2003 was passed.

Plaintiff also cites the personal deposition of Marcia St. Martin,[13] wherein Ms. Martin testifies that the Board had voted to terminate Plaintiff at the May 21, 2003 Board meeting. (Plaintiff's Ex. 2, St. Martin personal Dep. taken on 4/19/05, p. 24). However, later in that same deposition, Ms. Martin corrects that misstatement by explaining that the Board votes in open session, and (after reading the Minutes from the May 21, 2003 Board meeting), she testified that the Board did not vote to remove Plaintiff in the May 21, 2003 **open session**. (*See* Defendant's Reply Memo, Ex. E, St. Martin personal Dep., pp. 54-55).

Further, Ms. Martin testified that she did not attend the **Executive session** on May 21, 2003, has no personal knowledge of what happened in that session, and has not heard from any source that the Board voted in Executive session to terminate Plaintiff. (*Id.* at 55-56). In her corporate deposition, Ms. St. Martin testified that the actual date of Plaintiff's termination was June 18, 2003. (*See* Defendant's Reply Memo, Ex. 1, St. Martin Corporate Dep., pp. 93-94). This testimony is supported by the Minutes of the June 18, 2003 Board meeting and Resolution R-115-2003 (entitled "Termination of Harold Gorman"), which was adopted at that Board meeting. (*See* Defendant's Ex. I, Minutes of June 18, 2003 Board meeting, attached to Defendant's original memorandum, and

---

[13]    Ms. St. Martin gave two depositions: one in her corporate representative capacity, taken on 3/28/03; and one in her personal capacity on 4/19/03.

Defendant's Ex. 1, Resolution R-115-2003, attached to Defendant's Reply Memo.).

Further, Uncontested Material Facts contained in the Pre-Trial Order support a finding that Plaintiff was terminated on June 18, 2003, and not on May 21, 2003 as Plaintiff contends. Plaintiff was paid his salary until June 18, 2003. He retired retroactive to June 19, 2003 (not May 22, 2003), and has received retirement benefits since June 19, 2003 . (*See* Pre-Trial Order, Doc. No. 99, Uncontested Material Facts 20-24).

## (2) Aside from having expired substantive rights under the FMLA, Plaintiff's substantive claims are not absolute.

Plaintiff's interference claims consist of his claims that, during his FMLA leave: (a) the S&WB "terminated him by taking his job away and giving it to [his] assistant" and violated his "right to return to his job or an equivalent job;" and (b) the S&WB "took away his right to elect the DROP program." (Plaintiff's Opp. at 4 & 21).

To state a claim for interference with his substantive rights under the FMLA, an employee must establish by a preponderance of the evidence that he was entitled to the benefit denied. *Strickland*, 239 F.3d at 1206-07; *Rice v. Sunrise Express, Inc.*, 209

14

F.3d 1008, 1018 (7th Cir. 2000).[14]   The employer may then present

evidence to show that the employee would not have been entitled to

that benefit even if he had not taken leave.  29 U.S.C.

§2614(a)(3)(B); *Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259

F.3d 799, 804 (7th Cir. 2001).[15]   In other words, if an employer can

---

[14]    The *McDonnell Douglas* framework (which is applied in analyzing
retaliation claims under the FMLA, as discussed *infra*, pp. 23-29, does not
extend to deprivations of substantive rights under the FMLA.  *Chafin*, 179 F.3d
at 319, n. 13.

Further, the issue of the employer's intent (which is relevant in
a retaliation claim) is immaterial when an employee alleges a deprivation of
the substantive rights guaranteed by the FMLA.  *Rice v. Sunrise Express, Inc.*,
209 F.3d 1008, 1017 (7th Cir. 2000).

[15]    The Code of Federal Regulations, 29 C.F.R. §825.216, also
explains:

> Are there any limitations on an employer's obligation
> to reinstate an employee?
>
> (a)    An employee has no greater right to
>        reinstatement or to other benefits and
>        conditions of employment than if the employee
>        had been continuously employed during the FMLA
>        leave period.  An employer must be able to show
>        that an employee would not otherwise have been
>        employed at the time of reinstatement is
>        requested in order to deny restoration to
>        employment.  For example:
>
>    (1)    In an employee is laid off during the
>           course of taking FMLA leave and employment
>           is terminated, the employer's
>           responsibility to continue FMLA leave,
>           maintain group health benefits and restore
>           the employee cease at the time the
>           employee is laid off, providing the
>           employer has no continuing obligations
>           under a collective bargaining agreement or
>           otherwise. An employer would have the
>           burden of proving that an employee would
>           have been laid off during the FMLA leave
>           period and, therefore, would not be
>           entitled to restoration.
>
>            . . .

29 C.F.R. §825.216(a)(1).

show that it denied the employee a benefit (such as reinstatement)
for a reason wholly unrelated to the FMLA leave, the employer is
not liable for interference with a substantive FMLA right.

When the employer has met its burden of going forward, the
employee (who always bears the ultimate burden of establishing the
right to the benefit) must show by a preponderance of the evidence
that despite the characterization offered by the employer, the
benefit is guaranteed by the FMLA and "the benefit is one that the
employee would have received if leave had not been taken." *Rice*,
209 F.3d at 1018.

### (a)  Plaintiff's reinstatement claim

The S&WB has shown that Plaintiff would not have been entitled
to his position of Executive Director, or an equivalent position,
even if he had not taken the FMLA leave.  29 U.S.C. §2614(a)(3).
Defendant's summary judgment evidence establishes that when Mayor
Nagin took office in May 2002, *long before Plaintiff went on
medical leave*, the majority of the S&WB Board members indicated to
him that they wanted a change in the Executive Director's position.
(Defendant's Ex. B, Nagin Dep. at 17-18).

Further, on February 18, 2003, *some two weeks before Plaintiff
went on medical leave*, Mayor Nagin (*not knowing that Plaintiff had*

---

"With no absolute right reinstatement, whether an employer
violates the FMLA turns on why the employee was not reinstated. Clearly an
employee may not be fired because [he] took leave--that would be in direct
violation of the statute.  *See* 29 U.S.C. §2615(a)(2).  However, an employee
may be fired for poor performance when [he] would have been fired for such
performance even absent [his] leave."  *Kohls*, 259 F.3d at 805.

*skin cancer*) had actually requested that Plaintiff resign and enter retirement, and Plaintiff had agreed.  (Defendant's Ex. B, Nagin Dep. at 23-24; Defendant's Ex. A, Plaintiff's Dep. at 64-68 & Attachments 1 & 2).   There is no evidence that in lieu of Plaintiff's resignation and retirement, the S&WB would offer him a position equivalent to Executive Director, or any other position. Indeed, because Plaintiff was an at-will employee, the S&WB could have immediately and unilaterally terminated Plaintiff's employment on February 18, 2003.[16]   Instead, the S&WB amicably tried to negotiate with Plaintiff his voluntary resignation and retirement.

By June 18, 2003 (some four months after Plaintiff had agreed to resign and retire), Plaintiff had failed to voluntarily resign, and he was terminated.   Plaintiff argues that the Board knew he intended to retire, but that neither the Board nor President Nagin imposed any retirement deadline.   In support of this argument, Plaintiff cites the following testimony from President Nagin's

---

[16]   In a previous ruling in this case, the court found:

> as a matter of law, the executive director of the S&WB "shall hold office at the pleasure of the board." LSA-R.S. 33:4073.  Further, "[t]he election or removal of the executive director ... shall be determined by a majority vote of the entire board at one of its regular monthly meetings."  *Id.*  Thus, without a specific contract or agreement establishing a fixed term of employment, Plaintiff was an at-will employee who could be discharged by the S&WB "without assigning any reason for so doing" (provided, of course, that the discharge does not violate any statutory or constitutional provision).  La. Civil Code Art. 2747; *Brannon v. Wyeth Laboratories, Inc.*, 526 So.2d 1101, 1103-04 (La. 1988).

(*See* Court's Order entered on July 14, 2005, Doc. No. 90, p. 8).

personal deposition:

> Q. Did you give him a deadline: If you don't do this
> by that date, this is going to happen to you?
>
> A. We did not have that type of discussion.

(Defendant's Ex. C, Nagin Dep. at p. 24, lines 13-17, cited in

Plaintiff's Opp. at 5-6).

However, President Nagin had just previously explained in his

deposition, that he probably gave Plaintiff about two weeks to get

back with him to work out the details of Plaintiff's resignation

and retirement. (Defendant's Ex. C, Nagin Dep. at p. 24, lines 6-

10). In any event, Plaintiff's argument (based on his February 18,

2003 discussion with President Nagin) that he did not technically

have a "deadline" to resign and retire cannot circumvent the fact

that the S&WB had set the wheels of Plaintiff's departure in motion

before Plaintiff even took his FMLA leave.[17]

Further, during the four months between the initial February

18, 2003 conversation and Plaintiff's ultimate termination on June

18, 2003, Plaintiff failed to provide the S&WB with any details of

his resignation and retirement. Regarding the May 21, 2003

conversation between CAO Rice and Plaintiff, Mr. Rice explained:

> What I probably said to Mr. Gorman was, again,
> you know, **as we discussed with him several
> months before, the Mayor wanted to move in a
> different direction, he wanted a new Executive**

---

[17] *Tuberville v. Personal Finance Corp.*, 1996 WL 407571 *3 ("[W]here
wheels of termination were put in motion before the request for leave, the
court finds that the restoration provision should not apply").

> **Director** and you know, "Mr. Gorman, if we
> don't work out the details of your
> resignation, the Board is more than likely
> going to terminate you."

(Rice Dep. at 19, emphasis added).

When Plaintiff was ultimately terminated on June 18, 2003,

President Nagin reiterated that Plaintiff was terminated because:

> the Board had come to the conclusion that they
> wanted to go in a new direction.   It had
> reviewed his performance **over a period of time**
> **and had tried to come to an amicable**
> **separation based upon the conversation I had**
> **in February [2003]** with Mr. Gorman, and the
> Board decided that it was in the best interest
> of the City of New Orleans to move forward at
> that time.

(Defendant's Ex. B, Nagin Dep. at 60, emphasis added).

Finally, there is no evidence that Plaintiff was medically

incapable of finalizing his resignation and retirement before June

18, 2003.  Plaintiff was on FMLA leave from March 6, 2003 through

May 30, 2003, but (with his doctors' approval) he was able to

return to work for one week to travel to New York and Washington

D.C.  Further, while Plaintiff remained on "sick leave" after his

12 weeks of FMLA leave expired, Plaintiff attaches to his

Opposition not only his Affidavit wherein he states that he "was

able to perform the essential functions of [his] job as of the

third week of May, 2003," but also the Affidavits of his treating

physicians who attest that Plaintiff was medically capable of

returning to work in May 2003.  (Plaintiff's Opp., Plaintiff's

Affidavit, Ex. D & Affidavits of Drs. Penico, Swanton & Metzinger,

Exs. A-C).[18]

The court concludes that the S&WB denied Plaintiff reinstatement as Executive Director or an equivalent position, for a reason wholly unrelated to the FMLA leave, and Plaintiff has failed to show by a preponderance of the evidence that despite the characterization offered by the S&WB, reinstatement or an equivalent position is a benefit that Plaintiff would have received if leave had not been taken. U.S.C. §2614(a)(3)(B); 29 C.F.R. §825.216(a); *Rice*, 209 F.3d at 1018.[19]

### (b) Plaintiff's DROP claim

"DROP" is an acronym for the S&WB's "Deferred Retirement Option Plan" program. Under this program, Plaintiff claims he would have been permitted to work five more years with his salary

---

[18]     The court notes that with these Affidavits, Plaintiff is apparently attempting to rehabilitate his deposition testimony wherein he testified:

> Q.    Can you tell me when you believe you would have been capable of returning to the job as Executive Director of the Sewage & Water Board?

> A.    Well, I would say in -- you know, probably around that August 1 [2003] date.

(Plaintiff's Dep. at 93).

[19]     *See also Throneberry v. McGehee Desha County* Hospital, 403 F.3d 972, 977 (10th Cir. 2005)("an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights"); (Smith *v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002)("an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request"); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352-55 (11th Cir. 2000)(an employer who discharged an employee *while on FMLA leave* was not liable under an interference theory under the FMLA because the employer showed it would have discharged the employee even if employee not been on FMLA leave).

and benefits. (Plaintiff's Opp. at 2 & 4). The DROP program is explained in Rules and Regulations of the Employees' Retirement System of the Sewerage and Water Board of New Orleans, Article VII "Deferred Retirement Option Plan." (*See* Plaintiff's Ex. 13, Rules & Regulations of the S&WB's Employees' Retirement System, noted in fn. 20).

Plaintiff claims that in their February 18, 2003 conversation, he told Mayor Nagin, that he "intended to retire in the summer and enter the DROP program." (Plaintiff's Dep. at 67). But according to President Nagin the subject of DROP never came up in any of his conversations with Plaintiff. (Defendant's Ex. B at 28 & 53). The President Pro-Tempore of the S&WB, Mr. Henry Dillon, also testified that he did not recall Plaintiff ever discussing DROP with him. (Dillon Dep. at 23, attached to Defendant's Motion in Limine to Exclude Evidence Relating to DROP).

In any event, whether or not Plaintiff told President Nagin or the Board he intended to enter the DROP program before Plaintiff was terminated, does not create a genuine issue of material fact, because Plaintiff did not apply for DROP until March **2005**, long after he was terminated. As Marcia St. Martin explained in her corporate deposition, "[t]o enter the DROP program, you have to be an active employee at the time of retirement." (St. Martin Corp.

Dep. at 101).[20]   And, at this summary judgment juncture, there is

no evidence that Plaintiff was excluded from voluntarily retiring

and electing the DROP program between February 18, 2003 and June

18, 2003, when he was still employed by the S&WB.   Rather,

Plaintiff simply did not take the opportunity to do so, and he has

not shown, even by a scintilla of the evidence, that election of

the DROP program is a benefit that he "would have received if

---

[20]     *See also*, Plaintiff's Ex. 13, Rules and Regulations of the
Employees' Retirement System of the Sewerage and Water Board of New Orleans,
Article VII "Deferred Retirement Option Plan," which provides:

> 7.1 Election.   In lieu of terminating employment and
> accepting a Retirement Allowance under Section 6.1,
> **any Member of the Retirement System who is eligible to
> receive a Retirement Allowance under Section 6.1** may
> elect to participate in the Deferred Retirement Option
> Plan ("DROP") program and defer the receipt of
> benefits in accordance with the provisions of this
> Section....   (emphasis added)

Section 6.1 (referenced in Section 7.1 Election of DROP) states:

> 6.1 Retirement Allowance.
>
> (a) Eligibility.   Any **active** Member who [has met
> ceratin age and service requirements] may Retire
> after submitting his written application to the
> Personnel Department....  (emphasis added)

Further, according to the "DROP" pamphlet published by the S&WB, "[t]he
employee must be employed by the Board and meet requirements for regular
retirement at the time of enrollment in DROP."   (*See* DROP Pamphlet attached as
Ex. A to Defendant's Motion in Limine to Exclude Evidence Relating to DROP).

Thus, it appears that Ms. St. Martin's testimony that "[t]o enter the
DROP program, you have to be an active employee at the time of retirement," is
consistent with the plain language of the S&WB's "Rules and Regulations" and
DROP Pamphlet.

Plaintiff argues that "an **inactive** member of the retirement system, such
as Mr. Gorman, can elect the program as long as he has not withdrawn any
contributions from the retirement system."   (Plaintiff's Opp. at p. 8, n. 1,
emphasis added).   However, while Plaintiff generally cites the Board's Rules
and Regulations, he cites no specific provision of the Rules & Regulation to
support this argument.

22

[FMLA] leave had not been taken." *Rice*, 209 F.3d at 1018.[21]

**(B)    Defendant is entitled to summary judgment on Plaintiff's retaliation claim.**

Plaintiff claims that the S&WB retaliated against him for exercising his rights under the Family Medical Leave Act.  When direct evidence of discrimination is lacking, as is the case here, "the *McDonnell Douglas*[22] organizational framework applies to claims that an employee was penalized for exercising rights guaranteed by the FMLA."  *Chafin*, 179 F.3d at 319.

The three-part burden-shifting scheme places the onus on the plaintiff alleging an adverse employment action to first establish a *prima facie* case of discrimination that:

(1)    he engaged in a protected activity;

(2)    the employer committed an adverse employment action (or

---

[21]    According to the "DROP" pamphlet published by the S&WB,

The Deferred Retirement Option Plan (DROP) is an optional retirement program which allows an employee of the Sewerage & Water Board (the "Board") to elect to freeze his or her retirement benefits, but **continue to work** and draw a salary from the Board. While working, the retirement benefits are reported in a special account.

(*See* DROP Pamphlet attached as Ex. A to Defendant's Motion in Limine to Exclude Evidence Relating to DROP)(emphasis added).

Thus, the court questions whether Plaintiff (had he timely applied for DROP) would have been allowed to participate in DROP since DROP allows an employee to continue working, and Plaintiff's continued employment would have been in apparent contravention of President Nagin's request to Plaintiff on February 18, 2003, that he resign and retire.  However, the court need not resolve that issue because Plaintiff's failure to apply for DROP when he was still employed by the S&WB, made him ineligible for DROP.

[22]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

retaliation) against him; and

(3)   there is a casual connection between the protected activity and the adverse employment action.

*Id.*

Once the plaintiff makes this preliminary showing, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the employer carries this burden of production, the presumption raised by the *prima facie* case is rebutted.  *Id.* at 319-20.

Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 768 (5th Cir. 2001).

### (1)  *McDonnell Douglas* Part 1: *Prima facie* case

Here, the court assumes that Plaintiff established a *prima facie* case of retaliatory discharge.  Plaintiff engaged in "protected activity" when he took FMLA leave.[23]  Plaintiff suffered

---

[23]     Although the court previously found that Plaintiff was terminated after his FMLA leave had expired, and thus Plaintiff had no substantive right to reinstatement, "Plaintiff need not establish a violation of the substantive, prescriptive provisions of the FMLA to allege a violation of the proscriptive provisions."  *Hunt*, 277 F.3d at 768.

24

an adverse employment action because he was terminated.  And the
the temporal proximity between Plaintiff's protected leave and his
termination infers a causal connection.[24]

### (2) McDonnell Douglas Part 2: Burden Shift to Defendant

The court then inquires whether the S&WB produced legitimate,
nondiscriminatory reasons for Plaintiff's termination and the
Board's refusal to allow Plaintiff elect the DROP program.

### (a) The S&WB's reason for terminating Plaintiff

According to the summary judgment record, President Nagin
asked Plaintiff to resign and retire on February 18, 2003.
Plaintiff agreed to this request, but the details had to be worked
out.  Thus, the wheels of Plaintiff's removal were put in motion
before Plaintiff went on medical leave on March 6, 2003.

After Plaintiff went out on sick leave on March 6, 2003, the
S&WB continued to move forward and pressed Plaintiff for his
resignation and retirement.  Attempts to contact Plaintiff to

---

"The FMLA's protection against retaliation is not limited to
periods in which an employee is on FMLA leave, but encompasses the employer's
conduct both during and after the employee's leave." *Id.* at 768-69.

[24]     The causal link required by the third prong of the *prima facie*
case does not rise to the level of a "but for" standard.  *Gee v. Principi*, 289
F.3d 342, 345 (5th Cir. 2002).  The plaintiff "need not prove that his
protected activity was the sole factor motivating the employer's challenged
decision in order to establish the 'causal link' element of a *prima facie*
case." *Id.* (citation omitted).

However, while "[c]lose timing between an employee's protected
activity and an adverse action against him may provide the 'causal connection'
required to make out a *prima facie* case of retaliation ... once the employer
offers a legitimate, nondiscriminatory reason that explains both the adverse
action and timing, the plaintiff must offer some evidence from which the jury
may infer that retaliation was the real motive." *Swanson v. General Services
Administration*, 110 F.3d 1180, 1188 (5th Cir. 1997).

25

obtain a resignation date were unsuccessful, and for months after February 18, 2003, Plaintiff had not voluntarily resigned and retired.   Consequently, on June 18, 2003, the Board unanimously voted to terminate him.   President Nagin explained:

> the Board had come to the conclusion that they wanted to go in a new direction.   It had reviewed his performance over a period of time and had tried to come to an amicable separation based upon the conversation I had in February [2003] with Mr. Gorman, and the Board decided that it was in the best interest of the City of New Orleans to move forward at that time.

(Defendant's Ex. B, Nagin Corp. Dep. at 60).

President Nagin further explained that "new direction" meant "there was just a general sense that we were going through this privatization process, and the employees came up with lots of innovative ideas as well as the private companies, and we felt as though there was enough there to justify us trying some of those new ideas and concepts." (Defendant's Ex. C, Nagin Dep. at 12-13).

### (b)   The S&WB's reason for refusing to allow Plaintiff to elect DROP

Again, as Marcia St. Martin explained in her corporate deposition, "[t]o enter the DROP program, you have to be an active employee at the time of retirement." (St. Martin Corp, Dep. at 101; *see also* S&WB's Rules and Regulations noted in fn. 20). However, by the time Plaintiff was terminated, he had not availed himself of the opportunity to elect DROP.   After Plaintiff was terminated, he was no longer an "active employee" (at least

according to the Board's interpretation of its Rules and Regulations) and thus could not elect DROP.

The court finds that Defendant's reasons for terminating Plaintiff and refusing to allow him to elect DROP, if believed, would permit the trier of fact to conclude that the decision to fire Plaintiff and refuse to allow him to elect DROP (because his inactive status made him ineligible to do so) were legitimate and not retaliatory.[25]  Thus, Defendant has carried the burden of production, and the presumption raised by the *prima facie* case is rebutted.  Plaintiff was then obliged to present sufficient evidence to create a genuine issue of material fact to show that the Defendant's reasons were not the true reasons why Plaintiff was terminated and not allowed to elect DROP, and that the real reason was retaliation for exercising his right to FMLA leave.  *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 768 (5th Cir. 2001).

### (3) *McDonnell Douglas* Part 3: Burden Shift Back to Plaintiff

In response to Defendant's reasons, Plaintiff argues that at the end of the conversation between Plaintiff and President Nagin on February 18, 2003, and on the day Plaintiff went on FMLA leave, Plaintiff "had the right to retire and elect DROP."  Further, Plaintiff argues that although the Board (though President Nagin)

---

[25]     Defendant need not persuade the court that it was actually motivated by its proffered reasons.  *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179 (5th Cir. 1996).  Rather, Defendant's burden at this stage is one of production only, not persuasion, involving no credibility assessments. *Reeves*, 530 U.S. 133, 142 (2000), *citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

27

testified that it did not intend to eliminate Plaintiff's right to elect DROP when the Board terminated Plaintiff on June 18, 2003, that's just what the Board did "on May 21, 2003 and thereafter." (Plaintiff's Opp. at 24, *citing* Nagin Dep. at 53).

Just as he did with his interference/substantive claims, Plaintiff continues to argue with his retaliation claims, that Defendant terminated him on May 21, 2003, while he was on FMLA leave.  And as the court has already found, Defendant terminated Plaintiff (not on May 21, 2003 as Plaintiff argues) but on June 18, 2003, after Plaintiff had taken his 12 weeks of FMLA leave. Further, there is no evidence that the Board took away Plaintiff's right to elect DROP before the Board terminated Plaintiff.  Rather, Plaintiff just failed to avail himself of the opportunity to apply for DROP before he was terminated.

Thus, viewing the summary judgment evidence in the light most favorable to Plaintiff, the court finds that Plaintiff has failed to present competent summary judgment evidence that creates a reasonable inference that Defendant's reasons for terminating him and not allowing him to elect DROP were untrue.  And even if Defendant's reasons for terminating Plaintiff and not allowing him to elect DROP were not the true reasons for such actions, Plaintiff has failed to produce *substantial probative evidence* that the real

reason for his termination was retaliation for taking FMLA leave.[26]
*Chafin*, 179 F.3d at 320.  Thus, Plaintiff cannot survive summary
judgment.[27]

The issue at stake in an employment discrimination or
retaliation case is not whether the employer's decision is the
correct decision, or a fair decision, or the best decision; rather
the issue is whether the employer had a discriminatory or
retaliatory motive.  *Deines v. Texas Dep't of Protection and
regulatory Services*, 164 F.3d 279, 282 (5th Cir. 1999).

Here, Plaintiff is obviously unhappy with the S&WB's actions
that resulted in his termination and inability to elect the DROP
program, but in the absence of showing that the S&WB terminated him
or refused to allow him to elect DROP in retaliation for taking
FMLA leave, the Fifth Circuit has "repeatedly and emphatically
stated that anti-discrimination laws 'are not vehicles for judicial
second-guessing of business decisions.'"  *Mato v. Baldauf*, 267 F.3d
444, 452 (5th Cir. 2001)(citation omitted).

---

[26]     A reasonable factfinder after carefully reviewing the competent
summary judgment evidence could not properly conclude that Defendant's
proffered reasons for terminating Plaintiff were false and that the real
reason was retaliation for taking FMLA leave.  In *Reeves*, the Supreme Court
observed: "Certainly there will be instances where, although the plaintiff has
established a *prima facie* case and set forth sufficient evidence to reject a
defendant's explanation, no rational factfinder could conclude that the action
was discriminatory."  *Reeves*, 530 U.S. at 148.  Such is the case here.

[27]     "Summary judgment is appropriate in any case 'where critical
evidence is so weak or tenuous on an essential fact that it could not support
a judgment in favor of the nonmovant.'"  *Little v. Liquid Air Corp.*, 37 F.3d
1069, 1075-76 (5th Cir. 1994)(citation omitted).

### III.  Conclusion

For the reasons set forth above, the court finds that there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law, dismissing Plaintiff's Family Medical Leave Act claims.  Simply put, Plaintiff's substantive rights under the FMLA expired when Plaintiff failed to return to work after his 12 weeks of FMLA leave expired.  Further, Plaintiff's rights under the FMLA are not absolute.

The S&WB had decided to remove Plaintiff from his position of Executive Director *before* he took medical leave.  And although Plaintiff was an at-will employee who could have been immediately and unilaterally terminated by the S&WB, the S&WB attempted to negotiate with Plaintiff concerning his resignation and retirement.  After four months of waiting for Plaintiff to resign and retire, the S&WB terminated him (after his 12 weeks of FMLA expired) so that the Board could move in a new direction.

The fact that Plaintiff took FMLA leave affords him no greater rights that he would otherwise have had he not taken FMLA leave.  The S&WB had put the wheels in motion to remove Plaintiff before Plaintiff took his FMLA leave, and thus Plaintiff would have been removed from his position of Executive Director whether he took FMLA leave or not.  Further, Plaintiff has failed to show that his FMLA leave played any part in the S&WB's decision to terminate his employment and its attendant benefits, including election of the

30

DROP program.

Accordingly;

**IT IS ORDERED** that the **"Motion for Summary Judgment"** filed by Defendant, the Sewerage and Water Board of New Orleans, be and is hereby **GRANTED**, dismissing Plaintiff's Plaintiff's Family Medical Leave Act claims.

New Orleans, Louisiana, this *17* day of *Aug* , 2005.

_____
A.J. McNAMARA
UNITED STATES DISTRICT JUDGE